Filed 7/31/13  P. v. Velasquez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C068132 |
| Plaintiff and Respondent, | (Super. Ct. No. SF092392A) |
| v. | |
| MANUEL MEDINA VELASQUEZ, | |
| Defendant and Appellant. | |

A jury found defendant Manuel Medina Velasquez guilty of charges related to injuries he inflicted by shaking his infant daughter, resulting in what is known as "Shaken Baby Syndrome."  The trial court sentenced defendant to 12 years in state prison.  He appeals, claiming instructional error and prosecutorial misconduct.  He also appeals the imposition of a $30 court facilities fee, a claim the People concede.  We will strike the $30 fee and affirm the judgment as modified.

1

FACTS AND PROCEEDINGS

Defendant and Patty R. had a child together, A.R., born in March 2004. At the time, defendant and Patty lived in separate apartments in the same apartment complex. Patty and A.R. lived with Patty's 11-year old son, and defendant lived with his sister, Rosa, and his cousin, Daniel. Patty's sister, Maria C., also lived in the complex in the apartment below Patty's.

Several months after A.R. was born, defendant, Rosa, and Daniel moved to a house near the apartment complex. Patty's sister-in-law, Brenda O., moved into the apartment complex, along with Brenda's own baby, mother-in-law, husband, and two brothers-in-law. Brenda often babysat A.R. When she had A.R. overnight, Brenda slept in the bed with A.R., her husband and daughter slept on the bedroom floor, and the mother-in-law and brothers-in law all slept in the living room. When Patty went back to work after returning from maternity leave, she left the baby in Brenda's care three days a week.

Pediatrician Cesar Pabustan saw A.R. on April 5, 2004, for a routine exam. A.R. showed no sign of a health problem.

Dr. Pabustan saw A.R. again on May 3, 2004, for congestion, a runny nose and discharge from her eye. According to Patty, A.R. was coughing a lot and with such force that her face turned red. Dr. Pabustan diagnosed the baby as having a "common cold" and prescribed an antibiotic for her eye.

A.R. was seen a third time by Dr. Pabustan on May 10, 2004, for the same symptoms. On that visit, the doctor did not find anything that required treatment, and did not find anything abnormal with A.R..

On the morning of June 7, 2004, Brenda was awakened by A.R.'s crying. Brenda made A.R. a bottle and Brenda's husband fed A.R. Brenda dropped A.R. off with Patty

2

at approximately 9:00 p.m. that night. According to Brenda, the baby was playful and happy and "absolutely healthy."

The next day, Patty noticed A.R. was sweating a lot, so she gave her a bath and a Tylenol. A.R. fell asleep and slept until 4:30 p.m., when Patty took her to Rosa's house. Patty gave A.R. a kiss and left for work. When Patty called Rosa's house around 8:30 p.m. that night, defendant answered and said Rosa and the baby were already asleep. Defendant suggested Patty leave the baby there overnight. Patty agreed. Defendant said nothing about the baby being sick or having medical problems.

That night, Daniel noticed A.R. was "very serious . . . very quiet" and "seemed sad." A.R.'s feet were cold and sweaty, and she was spitting up her food.

Patty got off work at 2:15 a.m. the following morning and went directly home. Defendant called her around 8:00 a.m. and told her A.R. was crying. Patty told him to give the baby a bottle. Defendant asked what time she was going to pick A.R. up." Patty told him she was on her way, but fell back to sleep instead.

Defendant called Patty again around 9:00 a.m. and asked what time she was going to pick up A.R. because A.R. was crying. Patty told defendant to give her a bottle and, after instructing him how to make it, she got up, got dressed, and left for Rosa's house.

Approximately 15 minutes later, Patty received a call in her car from defendant telling her to hurry up because the baby was crying. While en route, Patty was delayed by a passing train. As she waited, defendant called her again, this time telling her "he didn't know what was wrong with the baby, that she was crying a lot." Patty told defendant she was waiting for the train and assured him she was on her way.

Defendant called Patty two more times. During the first call, he said A.R. was crying and could not breathe. He held the phone to A.R. and told Patty, "Take a listen as to how she's breathing." Patty could not hear very well. During the final call from defendant, Patty noticed A.R. was not crying like she had been in the prior calls. Patty

3

told defendant she was right around the corner. Defendant said, "Hurry up because I don't know what's wrong with the baby. She's not breathing right."

When Patty arrived at Rosa's house, defendant met her at the door with A.R. in his arms. The baby was pale and not moving. Her arms were limp, her head flopped, and her eyes were closed. Patty grabbed A.R. and told defendant to go to the hospital.

On the way to the hospital, Patty asked defendant what happened. Defendant said, "I don't know. She just got to crying and she cried and she cried and she got that way."

When they arrived at the hospital, defendant carried A.R. inside and a nurse rushed them back to a room where emergency room staff began resuscitation efforts. A.R. was pale, limp, and either not breathing at all or "in a breath holding pattern." As police questioned Patty and defendant, A.R. was flown to U.C. Davis Medical Center where she remained for approximately one month.

As a result of her injuries, A.R. suffered significant permanent brain damage severely compromising her ability to eat, drink, roll over, or crawl, and making it unlikely that she would ever be able to walk. Her developmental skills are "very delayed" and she has difficulty establishing eye contact or following an object. In short, her prognosis for a normal life was characterized as "very grim."

In 2005, defendant was tried by a jury on charges of felony child abuse (Pen. Code, § 273a, subd. (a)--count 1 (unless otherwise stated all statutory references are to the Penal Code)) and corporal injury to a child (§ 273d, subd. (a)--count 2), with a special allegation that he inflicted great bodily injury (§ 12022.7, subd. (d)). Defendant failed to appear on the sixth day of trial. When a bench warrant could not compel his presence, the trial court found good cause to continue the trial in his absence. At the conclusion of trial, the jury found defendant guilty as charged.

Six years later, defendant appeared in court for sentencing. The court denied probation and sentenced defendant to 12 years in state prison. The court imposed

4

specified fees and fines, including a $30 court facilities fee pursuant to Government Code section 70373, subdivision (a)(1).

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Instructional Error*

Defendant contends the trial court committed reversible error by instructing the jury pursuant to CALJIC No. 2.03 as follows: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

Our Supreme Court has consistently approved CALJIC No. 2.03. (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103; see *People v. Page* (2008) 44 Cal.4th 1, 50-52; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223-1224; *People v. Kelly* (1992) 1 Cal.4th 495, 531-532.) This instruction is proper where the only evidence of the falsity of a defendant's statement is its inconsistency with the prosecution's case at trial. (*People v. Arias* (1996) 13 Cal.4th 92, 141.)

Defendant's challenge to CALJIC No. 2.03 is twofold: First, he contends the instruction constituted improper vouching for the credibility of prosecution witnesses while simultaneously casting doubt on his credibility, thus depriving him of due process and trial by a fair and impartial jury. Second, he asserts there is no factual basis for the instruction.

The trial court stated it would give CALJIC No. 2.03 on consciousness of guilt based on statements defendant made to Patty on the morning of June 9, 2004. In that

5

regard, Patty testified defendant called her numerous times the morning of June 9, 2004, each call sounding more urgent than the last, asking her when she was coming to pick up A.R. and telling her the baby was crying and he did not know what was wrong. During the final call, Patty could hear A.R. "wasn't crying the way she was crying at first" and was laboring to breathe. By the time Patty met defendant at the door, A.R. was like a rag doll, pale, eyes closed, and barely breathing. On the way to the emergency room, Patty asked defendant what happened. Defendant answered, "I don't know. She just got to crying and she cried and she cried and she got that way."

The prosecution elicited testimony from several witnesses regarding A.R.'s status prior to the incident with defendant. A.R.'s mother, Patty, testified that prior to the incident with defendant, A.R. had no difficulty drinking or swallowing and had no issues with her head. Despite a close call a week prior when a truck pulled out in front of Patty's car causing her to brake quickly to avoid a collision, A.R. suffered no apparent injury, sitting quietly, securely buckled into her car seat in the back seat of the car. In short, according to Patty, A.R. had no medical problems prior to the incident with defendant other than a common cold.

A.R.'s pediatrician, Dr. Pabustan, testified that A.R. exhibited nothing abnormal from the time she was born until her last visit with him in late-May 2004. Other than having symptoms of the common cold in the weeks before the incident, A.R. showed no sign of any other problem.

Detectives Eric Kane and Juan Mendez both testified that Rosa said she checked on A.R. numerous times throughout the night and one last time before she left for work on the morning of June 9, 2004, and the baby was laughing and playing and appeared fine.

The prosecution elicited medical testimony from Dr. Daniel Terry, Dr. James Brandt, and Dr. Kevin Coulter. Dr. Terry testified that A.R.'s CT scan showed brain

6

hemorrhages in two different compartments of the brain caused by trauma. Dr. Terry opined that A.R.'s injuries were consistent with having been shaken.

Dr. Brandt, a licensed ophthalmologist, reviewed A.R.'s retinal images and observed multiple retinal hemorrhages he believed were consistent with "non-accidental trauma and shaken baby syndrome."

Dr. Coulter, an expert in Shaken Baby Syndrome, testified that the most common symptom of a child who has been shaken violently is a change in the child's mental status, that is, a child who is normally alert, smiling, or perhaps crying a little bit may become less alert, lethargic or, in extreme cases, unconscious.

Dr. Coulter testified that he examined A.R. while she was hospitalized in the intensive care unit. He reviewed her brain scans and observed several areas of bleeding within the subdural space and the actual brain tissue itself. He also observed injury to the soft tissue around A.R.'s spinal cord close to where the spinal cord attaches to the brain. He noted global anoxia--that is, large portions of A.R.'s brain that were injured due to deprivation of oxygen--and found hemorrhages within A.R.'s retina. Dr. Coulter concluded that the collection of injuries A.R. suffered were clear evidence of a non-accidental shaking event.

Dr. Coulter conducted specific tests to rule out bleeding disorders and metabolic diseases as the cause of A.R.'s subdural hematomas, and further ruled out birth defects, nasal congestion, sweaty hands and feet, and accidents such as falling off the bed or the type of sudden braking in the car described by Patty, as the cause of A.R.'s injuries. Dr. Coulter opined that A.R.'s injuries were "tragic" and, given the severity of her symptoms, the injuries likely occurred at the onset of those symptoms.

All that is required in order for CALJIC No. 2.03 to be given is some evidence from which a reasonable jury could conclude defendant's statements to be false or misleading. Here, defendant's account of the events that led to A.R.'s hospitalization and permanent injury was inconsistent with the testimony of numerous prosecution witnesses,

7

most notably the medical testimony that A.R.'s permanent disabilities were the result of brain and retinal hemorrhages, soft tissue injury around the spinal cord, and global anoxia, all of which were caused by non-accidental trauma and Shaken Baby Syndrome occurring immediately before Patty arrived at the house. Based on the medical testimony, "a jury could reasonably infer that [defendant's] statements were self-serving falsehoods intended to cast his conduct in the least culpable light." (*People v. Arias*, *supra*, 13 Cal.4th at p. 141.) The instruction was adequately supported by the evidence.

Further, because CALJIC No. 2.03 instructs the jury that it may infer a consciousness of guilt only if it first finds that the defendant made a willfully false or deliberately misleading statement concerning the charged crimes, and further informs the jury such evidence is not alone sufficient to prove his guilt, the instruction properly guides the jury's consideration of the evidence and does not lessen the prosecution's burden of proof. (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1224.) Moreover, "because [the instruction] precludes a jury from convicting a defendant based solely upon his or her dishonest statements relating to the crimes," it is favorable to the defense. (*People v. Page*, *supra*, 44 Cal.4th at p. 51.) And "[i]f the court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence." (*People v. Kelly*, *supra*, 1 Cal.4th at pp. 531-532.) There was no error, constitutional or otherwise.

II

*Prosecutorial Misconduct*

Defendant contends the prosecutor's closing argument included an improper analogy of the reasonable doubt standard to a puzzle of the American flag, resulting in a denial of due process and a fair trial. He adds that his attorney's failure to object was ineffective assistance of counsel. As we will explain, defendant forfeited this claim on appeal by failing to object below, and in any event, the claim fails on the merits.

The prosecutor's closing rebuttal argument included the following statements:

"And the final thing I wanted to address with you is reasonable doubt because it's kind of a difficult concept. Judge is going to read an instruction to you about reasonable doubt. And reasonable doubt does not mean beyond all doubt. You don't need to think to yourself, like I said, well, you know, it could have been the mailman, it could have been one of those guys in Brenda's apartment. Maybe that happened. Maybe just whole events--this is what happened. That's not reasonable doubt.

"I want you to pretend that you are holding a puzzle and you take out the puzzle and you start putting together pieces. And you start putting it together and you go home tonight and you start noticing some blue and some white stars in it, and then you get a red stripe about here and you get a white stripe and down here you see another red stripe and another white stripe. You start putting this puzzle together. You haven't finished yet, you still got a bunch of pieces to put in. You know when you are putting this puzzle where a white's going to be. You know it's a picture of and [*sic*] American flag even though you are missing some pieces. You know, and that's why.

"You know that this puzzle is of an American flag even though there are some pieces missing. That's the point you are at when you are beyond a reason [*sic*] doubt. You don't have all the pieces, but there is no--there is no other conclusion, this is an American flag. You are beyond a reasonable doubt at that point even though some of the pieces are missing.

"Just like in this case, you have all this evidence against the defendant. We have the injuries, we have the time frame when the defendant was alone with the baby. We have the fact that several people have said this baby appeared fine before her time with the defendant. No one has brought up any major injuries or any major problems with this baby before the morning of June 8th. And we have Dr. Terry's testimony that this happened within the last 12 hours. This is the point we are at when we are beyond a reasonable doubt." The defendant did not object to the prosecutor's statements.

9

Following closing argument, the trial court instructed jurors that they must follow the law as explained by the court, and to the extent the attorneys' comments on the law conflict with the court's instructions, jurors must follow the court's instructions.

The court further instructed the jury in relevant part as follows: "Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

In order to preserve a claim of prosecutorial misconduct, a defendant must make a timely objection and request an admonition, unless an admonition would not have cured the harm. (*People v. Friend* (2009) 47 Cal.4th 1, 29.) Had defendant done so here, the trial court could have instructed the jury that the prosecutor's remarks were not to be understood to suggest a different standard of proof than the one given in the instructions.

Even assuming the argument was not forfeited, it fails on the merits. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) A prosecutor commits misconduct when he misrepresents the standard of proof or trivializes the quantum of evidence required to meet the standard of proof. (*People v. Hill* (1998) 17 Cal.4th 800, 828-829.)

"When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion." (*People v. Booker* (2011) 51 Cal.4th 141, 184-185; see also *People v. Pierce* (2009) 172 Cal.App.4th 567, 572.) In evaluating the

10

prosecutor's remarks, "we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

Defendant argues the prosecution's use of a puzzle depicting "an easily and immediately identifiable picture of the American flag with a quantifiable number of missing pieces" is indistinguishable from the facts in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*). In that case, the prosecutor used a PowerPoint presentation in which six of eight puzzle pieces were added one by one until all of an image of the Statue of Liberty was visible except the face and the torch. (*Id*. at p. 1264.) The prosecutor then argued (over objection) that everyone would know at this point beyond a reasonable doubt that it was a picture of the Statue of Liberty even without the remaining pieces. (*Id*. at p. 1265.) This court found that the use of a readily recognizable icon could suggest to a jury that it was proper to leap to a conclusion on a far smaller quantum of evidence than would satisfy the standard of reasonable doubt. (*Id*. at pp. 1266-1267.) The use of a certain number of puzzle pieces also suggested an improper quantitative measure of the concept of reasonable doubt set at only 75 percent. (*Id*. at pp. 1267-1268.) The misconduct, however, was harmless because defense counsel vigorously disputed the prosecutor's analogy in his own closing argument, and the court told the jury that it would clarify the standard before it instructed the jury with the correct definition. (*Id*. at pp. 1268-1269.)

We need not decide the application of *Katzenberger* here or whether the prosecutor overstepped the bounds of permissible argument, because the error, if there was one, did not cause prejudice. The trial court instructed the jury to follow the law as given by the trial court, not the attorneys. Defense counsel reiterated that the jurors, not the judge or the lawyers, decide whether someone is guilty, and the focus should be on the facts, not on counsels' closing arguments. We presume the jury followed the trial court's instructions, including the instruction to disregard those statements of the law

given by attorneys that conflicted with the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Further, the court's jury instructions "unambiguously communicated to the jury that the prosecution had the burden of proving every element of the case beyond a reasonable doubt. The record does not demonstrate that the prosecution employed deceptive or reprehensible methods to persuade the jury, and, in light of the entire record, there was no reasonable likelihood that the jury erroneously construed the prosecution's burden of proof." (*People v. Samayoa* (1997) 15 Cal.4th 795, 842.)

Finally, we reject defendant's argument that the evidence against him was "hardly overwhelming." While he argues that "12 other people had access to, and could have harmed, [A.R.]," no one else had access to the child at the time the injury occurred. Nor were defendant's arguments that it was not certain A.R. was in fact shaken at all, that Patty did not know the proper method of holding her, that Patty shook her just before going to the hospital, or that the Tylenol Patty gave her might have caused her injuries in the least bit persuasive given the totality of the evidence and particularly the medical evidence presented at trial.

We conclude defendant's claim of prosecutorial misconduct fails for lack of prejudice. In light of that conclusion, and the weight of the evidence against defendant, his claim of ineffective assistance of counsel must also fail, as there is no reasonable probability that he would have obtained a more favorable result absent counsel's shortcomings. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; *Strickland v. Washington* (1984) 466 U.S. 668, 686.)

III

*Fee Assessment*

The trial court imposed a $30 court facilities fee pursuant to Government Code section 70373, subdivision (a) (enacted January 1, 2009). Defendant claims, and the People concede, that the fee only applies to convictions occurring after the effective date

of the statute (*People v. Davis* (2010) 185 Cal.App.4th 998, 1001), defendant was convicted on July 14, 2005, and thus imposition of the fee was improper.  The parties both agree that the error may be corrected on appeal despite the absence of an objection below.

We accept the People's concession and strike the fee accordingly.

DISPOSITION

The order imposing the $30 court facilities fee is reversed.  As modified, the judgment is affirmed.

      HULL      , Acting P.  J.

We concur:

      BUTZ      , J.

      MURRAY      , J.